1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MATTHEW S. ALLEN,

     Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

1:10cv01117 DLB

ORDER REGARDING PLAINTIFF'S
SOCIAL SECURITY COMPLAINT

## BACKGROUND

  Plaintiff Matthew S. Allen ("Plaintiff") seeks judicial review of a final decision of the
Commissioner of Social Security ("Commissioner") denying his application for disability
insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and
XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs,
which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States
Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

  In November 2005, Plaintiff filed applications for DIB and SSI.  AR 15, 87-91.  He
alleged disability since June 1, 2001, due a fractured "back and neck, chronic tendonitis, high
blood pressure, poor circulation, enlarged valve, leaky valve, loss of mobility, headaches,

---

[1] References to the Administrative Record will be designated "AR," followed by the relevant page number.

1    depression, anxiety, [and] loss of memory." AR 92, 123.  After being denied initially and on

2    reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR

3    58-59, 62-66, 68-72.  On October 12, 2007, ALJ Stephen W. Webster held a hearing.  AR 627-

4    57.  ALJ Webster denied benefits on January 7, 2008.  AR 12-29.  The Appeals Council denied

5    Plaintiff's request for review on April 21, 2010.  AR 2-4.

6         Hearing Testimony

7         ALJ Webster held a hearing on October 12, 2007, in Fresno, California.  AR 627.

8    Plaintiff appeared with his attorney, Melissa Proudian.  Vocational expert Cheryl Chandler also

9    appeared and testified.  AR 629.

10         Although Plaintiff initially alleged a disability onset date of June 1, 2001, his counsel

11   requested an amended onset date of August 25, 2005.  His date last insured was December 31,

12   2006.  AR 630-31.

13         Plaintiff was born in 1967. He is 5'10" and weighs 242.  He is unmarried and has an

14   eleven-year-old child.  He lives in a house with his girlfriend and his daughter.  He has a driver's

15   license, but does not drive very often because of his medications.  He can take care of some of

16   his personal needs, but needs help with washing from the waist down.  It is hard for him to help

17   with house work.  He can warm things in the microwave, but he cannot reach up in the

18   cupboards.  He can fold laundry and put it away, but he cannot bend over.  He does not work in

19   the yard or in the garden.  He watches television about 30 minutes throughout the day.  He does

20   not read or spend time on the computer.  His family comes to see him sometimes.  He does not

21   go to movies, but would be able to attend church if someone took him.  AR 630-34.

22         Plaintiff testified that he received a high school diploma.  He did not take any college

23   courses or receive vocational training.  He was never in the military service or in jail.  He has not

24   worked for pay since August 25, 2005.  He does not get welfare or food stamps.  AR 634-35.

25         Plaintiff confirmed that he has an injury to his neck and back, some degenerative disk

26   disease, diabetes, heart trouble and COPD.  His primary doctor is Katherine Baron, who he sees

27   once a month.  He also sees her helper, John Parker, twice a month.  They monitor his diabetes

28   and prescribe medications.  AR 635-37.

Plaintiff testified that he has pain from head to toe.  He has major pain in the right side of his neck and from his mid back down to his lower back.  He also has pain in his ankles, toes, feet, hips, legs, fingers, wrist on the lower left side, and elbows.  When his heart acts up, he gets pain in his neck area.  His medication helps relieve the pain.  AR 637-38.

Plaintiff explained that he can sit and stand for about 15 to 20 minutes.  He can walk slowly for about 15 or 20 minutes.  He uses a cane all the time.  He also has a walker and sleeps in a hospital bed.  He can lift a gallon of milk, but has problems lifting his arms overhead.  He does not have any problems picking up small objects.  AR 638-39.

In response to questions from his attorney, Plaintiff testified that he has problems with depression.  He gets irritable and has difficulty getting along with people.  He can concentrate for about 10 minutes and then needs to take a five or six minute break.  AR 641-43.

Plaintiff takes nitroglycerin for severe chest pains.  He generally takes one nitroglycerin tablet a day, which causes severe headaches.  Plaintiff sees his cardiologist on a regular basis. AR 643-44.

Plaintiff reported having suicidal thoughts a couple times per month.  When he's depressed, he prefers to be alone and isolates himself.  When he was on medication, he was doing fine.  Now that he doesn't have medication, he realizes that he needs something.  He missed appointments, so the doctor did not allow him to continue.  AR 645-47.

On a typical day, Plaintiff will rest about 15 or 20 times during the day for about 20 minutes each time.  Once a month, he has a lunch outing with his wife.  AR 647-49.

Plaintiff testified that since August 25, 2005, his condition had changed.  He has clogged arteries and he broke his back and neck.  In terms of his neck and back pain, his lifting, bending and walking ability has all changed since August 2005.  He cannot walk for more than short periods of time, he cannot sit and he can "lift hardly anything."  He is in constant pain.  His neck is a problem, he cannot turn his head to the right and he gets sharp pains and palpitations.  AR 649-50.

Plaintiff explained to the ALJ that he would rather work if he could.  He applied with the disability program at Vanier Community College.  He also applied at Table Mountain Casino and

1   Heartland's opportunity center in Madera.  He could not physically work at any job for eight

2   hours a day, five days a week.  He gets tired just going to the doctor's office.  AR 650-51.

3       The VE also testified in response to questions from the ALJ.  For the first hypothetical,

4   the ALJ asked the VE to assume a person of Plaintiff's age, education and work history.  The

5   ALJ also asked the VE to assume a person who could lift 20 pounds occasionally, 10 pounds

6   frequently, could stand or walk two out of eight hours and sit six out of eight hours.  This person

7   would have to use a cane and could not climb ladders.  The VE testified that this person could

8   not perform Plaintiff's past relevant work, but there would be jobs in the regional or national

9   economy that this person could perform.  The VE explained that the hypothetical profile is a

10  sedentary work classification and the full range of sedentary unskilled work would be available.

11  As an example, the VE identified 9,000 positions in California for bookkeeping, accounting,

12  account clerks in the unskilled, sedentary classification, which is DOT number 219.587-010.

13  Another example is information clerks, receptionist category, DOT number 237.367-046, with

14  12,700 jobs in California.  The VE also identified office assistant, in the unskilled category, DOT

15  number 205.367-030, with 8,500 jobs.  The VE affirmed that her testimony conformed with the

16  Dictionary of Occupational Titles.  AR 652-53.

17      For the second hypothetical, the ALJ asked the VE to assume the same factors as the first

18  hypothetical, but also to assume that this person would have to be able to sit or stand at will.  The

19  VE testified that this person could not perform Plaintiff's past relevant work.  There also would

20  be no jobs in the regional and national economy that this person could perform with concurrent

21  use of a cane for any standing functions.  AR 654.

22      <u>Medical Record</u>

23      After a car accident on May 7, 2005, Plaintiff was treated for neck and back pain.  AR

24  430-31.  C-spine x-rays were normal.  AR 434.

25      On May 27, 2005, Plaintiff was on a ladder working on a roof.  The roof started to

26  collapse, Plaintiff jumped off the ladder and the roof landed on his back.  Plaintiff was taken to

27  the hospital and had a L2 compression fracture, L1 through L3 transverse process fractures and

28  C3 to C4 ligamentous injury.  Neurosurgery recommended a TLSO brace and an Aspen collar.

Plaintiff was discharged from the hospital on May 31, 2005, in a stable condition and ambulating.  He was restricted from lifting, bending, driving and strenuous exercise.  AR 397-418.  During his hospital stay, Plaintiff was "very noncompliant with his Aspen collar . . . taking it off several times and then replacing it inadequately, sometimes upside down."  AR 398.

On June 9, 2005, Plaintiff ambulated with a cage walker, wore a cervical collar and appeared in moderate distress.  John Parker, PA-C, wrote Plaintiff a prescription for a wheelchair and recommended that he continue with pain medication.  AR 301-02.

X-ray views of Plaintiff's right knee completed on June 14, 2005, showed minimal early middle and anterior compartmental degenerative disease.  AR 426.  Lumbar spine x-rays taken on July 22, 2005, showed a stable L2 vertebral body compression fracture.  AR 389.  A cervical spine x-ray showed no fracture.  AR 390.

On August 9, 2005, an evaluation of Plaintiff's renal function showed excellent blood pressure control and stable renal function.  AR 452.

Lumbar spine x-rays taken on August 31, 2005, showed a mild anterior wedged compression fracture of L2 of indeterminate age, along with changes of degenerative disc disease involving L1-2 through L3-4.  AR 382.  Plaintiff was referred for physical therapy.  AR 383.

On September 26, 2005, Plaintiff underwent a physical therapy evaluation.  He complained of neck pain with right upper extremity paresthesia.  He had limited neck range of motion and was unable to hold objects in his right hand.  Plaintiff rated his pain at 10/10 at its worst and 6/10 at its best.  He reported difficulty with his activities of daily living and limited sitting, standing and walking tolerance of approximately 15 minutes, but was not using an assistive device to ambulate.  He was to undergo physical therapy twice a week for 6 weeks.  AR 213-15.

A right knee MRI completed on October 5, 2005, showed old thickening of the superficial layer of the medial collateral ligament.  AR 296.  On that same date, PA Parker wrote a prescription that Plaintiff permanently needed a wheelchair and a hospital bed.  AR 297.

1    Lumbar spine x-rays taken on October 28, 2005, showed a moderately severe

2    compression fracture of the L2 vertebral body of unknown age and multilevel degenerative

3    changes.  AR 216.

4    On February 25, 2006, Dr. Steven Stoltz completed a consultative internal medicine

5    evaluation.  Plaintiff attended the examination in a wheelchair and needed help from his wife to

6    transfer to the exam table.   On examination, Plaintiff's range of motion of his shoulders, elbows,

7    wrists, hips, knees and ankles was within normal limits.  His strength was 5/5 in all extremities.

8    Dr. Stoltz diagnosed type II diabetes mellitus, hypertension, hyperlipidemia, chronic low back

9    pain and cervical neck pain.  Based on the examination, Dr. Stoltz opined that Plaintiff would be

10   restricted to standing or walking that would require the use of a cane or a walker for less than two

11   hours in a normal eight-hour workday.  He could lift and carry less than 10 pounds and could not

12   work on ladders or climb stairs.  Dr. Stoltz further opined that Plaintiff could sit in his wheelchair

13   for six hours in a normal eight-hour work day, but would need more frequent changes in position.

14   AR 369-74.

15   On February 25, 2006, Dr. Ekram Miehiel completed a consultative psychiatric

16   evaluation.  Plaintiff reported that he takes care of personal hygiene.  During the day, he will

17   sleep, sit or lie down watching television.  Plaintiff had poor eye contract throughout the

18   interview.  On mental status exam, his mood was depressed and his affect was intense.  His

19   thought process was goal-directed.  Dr. Miehiel diagnosed an adjustment disorder with depressed

20   mood and rated Plaintiff's Global Assessment of Functioning ("GAF") as 50-55.   Dr. Miehiel

21   opined that Plaintiff was unable to maintain attention and concentration or carry out one or two

22   step simple job instructions.  Plaintiff's symptoms of depression mixed with anxiety symptoms

23   and other feelings made it difficult for him to relate to coworkers, supervisors and the general

24   public.  He was able to handle his own funds.  AR 375-78.

25   On April 12, 2006, B.X. Vaghaiwalla, a state agency medical consultant, completed a

26   Physical Residual Functional Capacity Assessment form.  Dr. Vaghaiwalla opined that Plaintiff

27   could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk at

28   least 2 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and push and/or

pull without limitation.  Plaintiff occasionally could climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb a ladder, rope or scaffolds.  He had no manipulative, visual, communicative or environmental limitations.  AR 270-77.

On May 18, 2006, Tara Z. May, Ph.D., conducted psychological testing at the request of Dr. Andrew Whyman.  Dr. May reported that Plaintiff's responses on the Minnesota Multiphasic Personality Inventory-2 raised serious concerns regarding the profile's validity.  Plaintiff endorsed an extremely high number of infrequent responses.  Absent significant psychopathology, the validity scales suggested significant overemphasis of psychological problems.  Dr. May opined that Plaintiff's overall test scores suggested overreporting of the extent and severity of physical and emotional problems.  AR 363-66.

On May 18, 2006, Andrew D. Whyman, M.D., completed a psychiatric Agreed Medical Examination.  Plaintiff reported anxiety, mood swings, hopelessness, anger, depression, difficulty breathing, leg and back pain, heart pain and dizziness.  He explained that he has not just mental, but mostly physical problems.  Plaintiff was not interested in further care for emotional issues.  Dr. Whyman noted that Plaintiff sat throughout the examination and carried a cane.  On mental status examination, Plaintiff seemed a bit too eager to please.  There was no psychomotor retardation, blunting or flattening of affect, but there was occasional modest dysphoric affect.  There was no thought disorder.  Plaintiff's attention and concentration span were sufficient, but he had difficulty with simple calculation and trouble reading at a high school level.  Following psychological testing, Dr. Whyman indicated that the resulting profile was "of questionable validity primarily due to suggested overreporting [sic] of symptoms across test instruments."  Dr. Whyman diagnosed Plaintiff with dysthymia, dyslexia, and dependent and histrionic personality features.  Plaintiff showed evidence of a mild to moderate depressive disorder.  Dr. Whyman noted that Plaintiff was a somewhat compromised historical informant. His learning disability appeared to compromise his accurate recall of events chronologically and he had a measure of repression and denial.  Dr. Whyman opined that Plaintiff was no longer in need of therapy and had a GAF of 61 with mild to moderate symptoms, occasionally depressed mood, mild insomnia and some difficulty in occupation and social functioning.  AR 336-53.  On

1  a summary form, Dr. Whyman opined that Plaintiff did not need current or future medical care

2  and could return to his usual job.  AR 354.

3      On May 19, 2006, G. K. Ikawa, a state agency medical consultant, completed a

4  Psychiatric Review Technique form.  Based on an adjustment disorder with depressed mood, Dr.

5  Ikawa opined that Plaintiff had moderate restriction of activities of daily living, mild difficulties

6  in maintaining social functioning, moderate difficulties in maintaining concentration, persistence

7  or pace and no episodes of decompensation.  AR 262-66.

8      Dr. Ikawa also completed a Mental Residual Functional Capacity Assessment form.  Dr.

9  Ikawa opined that Plaintiff was moderately limited in the ability to understand and remember

10  detailed instructions and moderately limited in the ability to carry out detailed instructions.

11  Plaintiff was able to sustain simple, repetitive tasks and was able to relate and adapt.  AR 267-69.

12      A cardiac catheterization of Plaintiff on June 7, 2006, revealed that the left main coronary

13  artery had no significant disease, left anterior descending had mild 20% diffuse disease, the left

14  circumflex artery had 50% proximal first obtuse marginal artery disease and 70% proximal

15  second obtuse marginal artery branch disease and the right coronary artery had diffuse 30%

16  disease.  Plaintiff had normal left ventriculogram function.  AR 327-28.

17      A holter monitor recording of Plaintiff's heart completed on August 4, 2006, showed a

18  mean heart rate of 75 and no arrythmias.  AR 326.  An echocardiogram completed on September

19  19, 2006, showed a normal EF of 60% and mild mitral regurgitation.  AR 325.

20      Electromyography of the lower extremities completed on October 26, 2006, was normal,

21  without evidence of radiculopathy, plexopathy or peripheral nerve abnormality.  Nerve

22  conduction studies of both lower extremities also were normal.  AR 257-59.

23      A MRI of the lumbar spine completed on November 10, 2006, showed no acute

24  abnormality.  Plaintiff had a chronic L2 fracture deformity.  AR 260-61.

25      On November 16, 2006, Dr. Baron reported that Plaintiff had been her patient since

26  October 2002, and had since become totally and permanently disabled.  She indicated that

27  Plaintiff had spinal stenosis and back pain, internal derangement of his knee, a gait disturbance

28  requiring assistive devices, poorly controlled diabetes, coronary artery disease with frequent

chest pain and palpitations, neuropathy, hypertension, hernaturia, hyperlipidemia and untreated depression. He also took "chronic large does of narcotics and muscle relaxers from a pain management physician." Dr. Baron opined that Plaintiff could not stand, sit or walk for more than 20 minutes without changing his position and he could not lift or carry. He was forgetful and could not think clearly at times. He was precluded from strenuous work and he was not capable of working light duty. Dr. Baron further opined that absent the mental problems, Plaintiff was "physically incapable of sitting, standing or walking for any length of time and there are basically no jobs that allow for constant fidgeting." AR 286.

On December 31, 2006, Richard G. Baker, M.D., an Agreed Medical Evaluator, completed an examination and record review. Plaintiff reported very high levels of interference with activities of daily living, estimating that he could lift 1 to 2 pounds, walk 15 to 20 feet, stand 10 minutes, sit 5 minutes and drive 5 to 10 minutes. He also reported an inability to grocery shop, do housework, hunt, fish, hike or raise animals. AR 246. On examination, Plaintiff presented with a cane on the right side. He demonstrated pain behaviors, including facial grimacing, a distorted gait, moaning or audible expressions of pain and stooping while walking. AR 249. Examination of his knees, lower legs, ankles and feet generally did not produce significant findings and there was no visible atrophy in the lower extremities. His Waddell's test was positive in 4 of 5 categories. Lower extremity electrodiagnostic testing was completely negative. AR 250.

Dr. Baker diagnosed chronic bilateral lower tendinosis and myofascial pain, chronic lumbar strain, mild lumbar degenerative disease, L2 vertebral body deformity with L2-3 retrolisthesis and probable psychosocial factors affecting physical conditions. AR 251. Dr. Baker characterized Plaintiff's bilateral lower extremity symptomatology as intermittent and slight/moderate with prolonged weightbearing. Plaintiff's physical examination was "nonspecific, revealing diffuse tenderness, diffuse numbness, diffuse weakness, etc." Dr. Baker recommended that Plaintiff be precluded from prolonged weightbearing. With regard to his low back, Dr. Baker characterized the symptomatology as intermittent and moderate with heavy lifting, repeated bending of the back, and repeated twisting of the back. Dr. Baker indicated that

there were "no clear objective factors of disability relating to the back condition" and Plaintiff's back disability was "best described by a preclusion from Heavy Work."  AR 254.  Dr. Baker did not find a clear physiologic basis to explain Plaintiff's need for a cane or walker.  AR 255.

A stress test in January 2007 showed no evidence of significant ischemia or scar.  AR 205.

On January 26, 2007, A. M. Khong, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form.  Dr. Khong opined that Plaintiff could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently.  He could stand and/or walk at least 2 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation.  He also could occasionally climb, balance, stoop, kneel, crouch and crawl.  AR 278-82.

On January 31, 2007, PA Parker noted that co-existing diabetes and depressive problems were related to Plaintiff's chronic back pain and sedentary situation.  Plaintiff was stable and his work status was "disabled."  AR 186-87.

On February 28, 2007, Plaintiff complained to Dr. Baron of chronic low back pain.  He denied any weakness in his legs.  AR 184.

On March 7, 2007, Plaintiff saw PA John Parker for his type II diabetes, hypertension, coronary artery disease, hyperlipidemia and nicotine habituation.  AR 181.  On March 21, 2007, Plaintiff requested an increased number of Vicodin per month, but PA Parker declined to provide more.  AR 179.

On March 28, 2007, Plaintiff told Dr. Baron that he had persistent achy pain in his lower back and bilateral leg paresthesias.  He ambulated with a cane and was given a refill of his Vicodin.  AR 177.

On May 3, 2007, Plaintiff complained of increased low back pain and reported trying to perform pushups a few days earlier.  On exam, Plaintiff was obese and ambulated with a cane.  His range of motion demonstrated forward flexion with tenderness over the bilateral sacroiliac regions.  Straight leg raising in the supine position was essentially negative.  Plaintiff was given a refill on his Vicodin.  AR 173.

On May 30, 2007, Dr. Baker prepared a supplemental report following a review of additional records.  Dr. Baker indicated that he was now aware that on May 27, 2005, Plaintiff suffered significant trauma to his neck and back.  Dr. Baker represented that Plaintiff did not inform him of the injury.  Given the "very significant historical omissions," Dr. Baker opined that neither Plaintiff's history nor his subjective representations could be deemed reliable.  Dr. Baker further opined that Plaintiff did not have new and further disability relating to his lower extremity conditions.  He remained of the opinion that Plaintiff's industrial back condition was permanent and stationary as of March 1, 2004.  Dr. Baker indicated that given the relatively non-specific physical examination findings, it was his opinion that Plaintiff's back symptomatology should be characterized as constant and slight, intermittently becoming moderate with heavy or repetitive lifting, repetitive bending or twisting of the back, prolonged sitting, and prolonged stationary standing.  AR 235.  Plaintiff had preclusions from substantial work, prolonged stationary standing and prolonged sitting.  AR 226-36.

On May 31, 2007, Plaintiff complained of pain in his right and left lower legs and lower back area.  He expressed interest in vocational training.  On exam, he was in no distress, but had some palpable spasms in the lumbar area.  AR 171.

On June 7, 2007, Plaintiff saw PA Parker and reported that he was not really doing any home blood glucose monitoring.  AR 168- 70.

On June 27, 2007, Plaintiff saw PA Parker for diabetes, hyperlipidemia and coronary artery disease.  Plaintiff ambulated with a cane.  AR 165-67.  That same date, Dr. Baron noted that Plaintiff's physical examination remained the same.  AR 163-64.

Imaging of Plaintiff's arteries completed on July 19, 2007, showed a normal carotid ultrasound with antegrade flow through both vertebral vessels.  AR 204.

On July 31, 2007, Plaintiff told Dr. Baron that he went to Washington and Oregon on vacation.  On examination, he walked with a cane and had palpable spasms in his lower lumbar area.  Dr. Baron identified a history of depression related to Plaintiff's chronic pain.  AR 157-61.  An x-ray of his abdomen was normal.  AR 162.

On August 29, 2007, Dr. Baron noted that Plaintiff's pain remained the same.  He was given refills of his medication.  AR 155-56.

On September 21, 2007, Plaintiff saw Nurse Practitioner Laura Slippy.  Plaintiff denied back pain, joint pain, joint swelling, muscle cramping, muscle weakness and stiffness.  On physical examination, his gait and station were normal.  Nurse Slippy opined that Plaintiff could undergo exercise testing and/or participate in an exercise program.  She noted that his asthma and COPD were unchanged and his diabetes was uncontrolled.  AR 150-54.

Following a holter monitor recording in April 2008, Dr. Charles H. Sohn began treating Plaintiff for paroxysmal atrial fibrillation.  AR 624.  A subsequent stress test showed no evidence of significant ischemia or scar.  AR 625.  An echocardiogram showed mild left atrial enlargement, but no significant valvular abnormalities.  AR 626.

Lumbar spine x-rays taken on December 18, 2008, showed anterior wedging of the L2 vertebral body consistent with a compression fracture of indeterminate age, along with degenerative disc disease in the lumbar spine.  AR 240.

ALJ's Findings

The ALJ first explained that Plaintiff was found not disabled in a prior hearing decision dated August 24, 2005.  Therefore, the presumption of continuing non-disability applied to the unadjudicated period after August 24, 2005, and the ALJ could not make different findings unless there was new and material evidence.  AR 16; *Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988).  The ALJ concluded that the presumption did not apply because it had been discovered that Plaintiff had coronary artery disease, which was not addressed in the prior decision.  AR 16.

As to the current application, the ALJ found that Plaintiff met the insured status requirements through December 31, 2006, but had not engaged in substantial gainful activity since August 25, 2005.  The ALJ further found that Plaintiff had the severe impairments of degenerative disc disease, status post compression fracture at L2, coronary artery disease and obesity.  Despite these impairments, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to lift and/or carry 20 pounds occasionally and 10 pounds frequently, to sit 6 hours per day and to stand and/or walk 2 hours per day.  He also required a

1  cane to ambulate and could not climb ladders.  AR 19.  With this RFC, the ALJ concluded that

2  Plaintiff could not perform his past relevant work, but could perform other work that exists in the

3  national economy.  AR 17-28.

4  **SCOPE OF REVIEW**

5       Congress has provided a limited scope of judicial review of the Commissioner's decision

6  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

7  the Court must determine whether the decision of the Commissioner is supported by substantial

8  evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

9  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

10  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

11  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

12  401.  The record as a whole must be considered, weighing both the evidence that supports and

13  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

14  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

15  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

16  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

17  Commissioner applied the proper legal standards, and if the Commissioner's findings are

18  supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d

19  509, 510 (9th Cir. 1987).

20  **REVIEW**

21       In order to qualify for benefits, a claimant must establish that he is unable to engage in

22  substantial gainful activity due to a medically determinable physical or mental impairment which

23  has lasted or can be expected to last for a continuous period of not less than 12 months.  42

24  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

25  such severity that he is not only unable to do his previous work, but cannot, considering his age,

26  education, and work experience, engage in any other kind of substantial gainful work which

27  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

28

1   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

2   Cir. 1990).

3       In an effort to achieve uniformity of decisions, the Commissioner has promulgated

4   regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

5   C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g).  Applying the process in this case, the ALJ found

6   that Plaintiff: (1) had not engaged in substantial gainful activity since his alleged onset date; (2)

7   has an impairment or a combination of impairments that is considered "severe" (degenerative

8   disc disease, status post compression fracture at L2, coronary artery disease and obesity) based on

9   the requirements in the Regulations (20 C.F.R. §§ 404.1520(c), 416.920(c)); (3) does not have an

10  impairment or combination of impairments which meets or equals one of the impairments set

11  forth in Appendix 1, Subpart P, Regulations No. 4; (4) he could not perform his past relevant

12  work; but (5) could perform other jobs in the national economy.  AR 17-28.

13      Here, Plaintiff contends that the ALJ erred by rejecting the opinions of Drs. Baron and

14  Stoltz and by rejecting evidence of a severe mental impairment.

15                                    **DISCUSSION**

16  A.    Treating Physician Rule

17      Plaintiff claims that the ALJ erred by failing to give controlling weight to the limitations

18  imposed by his treating physician, Dr. Baron.

19      Treating physicians are owed considerable deference.  *Edlund v. Massanari*, 253 F.3d

20  1152, 1157 (9th Cir.2001).  A treating physician's medical opinion as to the nature and severity

21  of an individual's impairments must be given controlling weight if that opinion is well-supported

22  and not inconsistent with other substantial evidence in the case record.  Social Security Rule 96-

23  2p.  If contradicted by another doctor, however, the opinion of a treating physician can "be

24  rejected for specific and legitimate reasons that are supported by substantial evidence in the

25  record." *Edlund*, 253 F.3d at 1157 (internal quotation marks omitted).  The "reasons must be

26  sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to

27  the treating source's medical opinion and the reasons for that weight." *Id.* (internal quotation

28

marks omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in

medical testimony, and resolving ambiguities." *Id.* at 1156.

Here, the ALJ expressly discussed Dr. Baron's opinion that Plaintiff could not stand, sit

or walk for more than 20 minutes without changing position and was unable to lift or carry.  The

ALJ also noted Dr. Baron's statements that Plaintiff was forgetful, expressed thoughts of

hopelessness and death, and suffered from untreated depression, along with her statements that

he was not capable of working light duty and that there were no jobs that allowed for constant

fidgeting.  AR 22.

The ALJ declined to assign Dr. Baron's opinion controlling weight.  First, the ALJ

rejected her opinion that Plaintiff was totally and permanently disabled because it was a

conclusion reserved to the Commissioner.  AR 22.  "Although a treating physician's opinion is

generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect

to . . . the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th

Cir. 2001).  The law reserves the disability determination to the Commissioner.  *McLeod v.*

*Astrue,* 634 F.3d 516, 520 (9th Cir. 2011) (noting that an impairment is a purely medical

condition, but a disability is an administrative determination of how an impairment affects ability

to engage in gainful activity).

The ALJ next rejected Dr. Baron's conclusions that Plaintiff was not capable of working

light duty and that there were basically no jobs that allowed for constant fidgeting because these

were vocational issues reserved to the Commissioner.  AR 22, 286.  Plaintiff asserts that this is

neither a good nor a specific and legitimate reason to discount Dr. Baron's commonsense

understanding of work.  However, the application of vocational factors is an issue reserved to the

Commissioner, and no special significance need be assigned to the opinion of a medical source

as to that issue.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).  In other words, the availability of

work is not the proper basis for a medical determination.  Thus, the ALJ did not err in

discounting Dr. Baron's opinion regarding vocational issues.

The ALJ further rejected Dr. Baron's opinion because it appeared based on Plaintiff's

self-reported limitations, rather than objective findings.  AR 22.  A lack of supporting clinical

1 findings is a valid reason for rejecting a treating physician's opinion. *Magallenes v. Bowen*, 881

2 F.2d 747, 751 (9th Cir. 1989); s*ee also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190,

3 1195 (9th Cir. 2004) (ALJ properly discounted or assigned minimal weight to treating physician

4 opinions that were unsupported by objective evidence and that lacked substantive medical

5 findings); *Holohan v. Massanari*, 246 F.3d 1195, 1202 n. 2 (9th Cir. 2001) (stating that a

6 physician's opinion may be "entitled to little if any weight" where the physician "presents no

7 support for her or his opinion"); *Burkhart*, 856 F.2d at 1339 (ALJ properly rejected treating

8 physician opinion where it was unsupported by medical findings, personal observations or test

9 reports). Dr. Baron's treatment records included only limited clinical findings, noting in certain

10 records that Plaintiff walked with a cane and on two occasions he had "some palpable spasm in

11 the lower lumbar area." AR 155, 157, 171. Thus, the ALJ did not commit error in rejecting Dr.

12 Baron's statements because there was no description of objective medical findings to support her

13 conclusions.

14     Although Dr. Baron provided her opinion regarding Plaintiff's functional limitations, the

15 ALJ correctly noted that Plaintiff was primarily treated by Mr. Parker, a physician assistant, and

16 not Dr. Baron. AR 22. In challenging this finding, Plaintiff observes that "in a world with

17 limited resources . . . a physician's assistant will provide some or even most of the care," but this

18 "does not . . . deprive the physician of the longitudinal relationship." Opening Brief, p. 16.

19 However, when determining the weight to give a medical opinion, an ALJ must consider the

20 "[l]ength of the treatment relationship and the frequency of examination" by the treating

21 physician and the "nature and extent of the treatment relationship" between the patient and the

22 treating physician. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Orn v. Astrue*, 495 F.3d 625, 631

23 (9th Cir. 2007). As such, the ALJ correctly considered the frequency of examination by Dr.

24 Baron.

25     Given the lack of objective findings, the ALJ surmised that Dr. Baron's opinion appeared

26 based on Plaintiff's subjective complaints. AR 22. It is not error for an ALJ to discount a

27 treating physician's opinion that is based on a claimant's subjective complaints. *See Bray v.*

28 *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). Indeed, when the record

1  supports the ALJ's discounting of the claimant's credibility, the ALJ is free to disregard a doctor's

2  opinion premised on the claimant's subjective complaints. *See Tonapetyan*, 242 F.3d at 1149;

3  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (ALJ did not err in disregarding physician's

4  opinion that was premised on claimant's properly discounted subjective complaints).  In this

5  case, Plaintiff has not challenged the ALJ's credibility findings.

6      Based on the above, the ALJ provided specific and legitimate reasons, supported by

7  substantial evidence, for discounting Dr. Baron's opinion.

8  B.    Consultative Examiner's Opinion

9      Plaintiff next argues that the ALJ improperly rejected the opinion of Dr. Stoltz, a

10  consultative examining physician.  The uncontradicted opinion of an examining physician can

11  only be rejected for "clear and convincing" reasons.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

12  1996).  However, where a consultative examiner's opinion is contradicted by another doctor, the

13  ALJ can reject this opinion by providing "specific and legitimate reasons that are supported by

14  substantial evidence in the record."  *Id.* at 830-31.  Here, Dr. Stoltz's opinion was contradicted by

15  the opinions of Dr. Baker and of the state agency physician.  As such, the ALJ was entitled to

16  reject Dr. Stoltz's opinion by providing specific and legitimate reasons.

17      In this case, the ALJ declined to assign weight to Dr. Stoltz's opinion for several reasons.

18  First, the ALJ noted that the limitations imposed by Dr. Stoltz were based on false information

19  provided by Plaintiff, namely that he had two "cracks" in his neck.  AR 24.  Plaintiff contends

20  that Dr. Stoltz based his opinion on the examination and objective findings, not on Plaintiff's

21  incorrect information.  Plaintiff further asserts that Dr. Stoltz knew that he provided incorrect

22  information based on a review of his medical records.  Opening Brief, p. 17.  According to Dr.

23  Stoltz's report, however, he did not have a complete copy of Plaintiff's medical records to

24  review.  AR 374.  Further, Dr. Stoltz found that Plaintiff's main medical issue centered around

25  his musculoskeletal and neurological issues from the back and the neck.  AR 374.  There is no

26  indication that Dr. Stoltz discounted Plaintiff's report of a cracked neck.  Accordingly, the ALJ

27  reasonably discounted Dr. Stoltz's opinion to the extent was based on Plaintiff's incorrect

28  statements.  *See, e.g., Bray*, 554 F.3d at 1228 (ALJ reasonably discounted physician opinion

1  based on claimant's less than credible statements); *Fair*, 885 F.2d at 605 (ALJ did not err in

2  disregarding physician's opinion that was premised on claimant's properly discounted subjective

3  complaints).

4        Next, the ALJ found that Dr. Stoltz's lifting restriction of less than 10 pounds was "out of

5  line with the objective evidence." AR 24.  An ALJ may properly reject an examining physician's

6  opinion that is inconsistent with the medical record. *Batson*, 359 F.3d at 1195.  Here, the ALJ

7  recognized objective evidence of a compression fracture at L2 and degenerative disc disease of

8  the lumbar spine with no objective evidence of radiculopathy.  However, the ALJ also cited

9  inconsistent physical testing results, along with a number of positive Waddell's tests that

10  indicated malingering.  AR 25, 250.  The ALJ further noted that Plaintiff complained of neck

11  pain, but there was no evidence of fracture or of significant disc disease in the record.  The ALJ

12  indicated that after a fall in May 2005, Plaintiff only had a ligamentous injury that was treated by

13  a neck brace.  The ALJ then commented that Plaintiff had compliance problems with wearing the

14  neck brace.  AR 25, 397-418.  Additionally, the ALJ considered recent treatment notes indicating

15  that Plaintiff had no complaints of back pain and was cleared to start an exercise program.  AR

16  25, 150-54.  Given the lack of objective evidence, the ALJ properly discounted Dr. Stoltz's

17  lifting limitation.   Plaintiff points to no contrary evidence in the record.

18        Additionally, the ALJ discounted Dr. Stoltz's February 2006 opinion that Plaintiff could

19  sit in his wheelchair for six hours per day with changes in position, because Plaintiff did not

20  require a wheelchair when seen by other physicians.  AR 24, 374.  Plaintiff argues that he is

21  "confined to wheelchair."  He also contends that Dr. Stoltz's opinion was based on clinical

22  observations and he was not "easily duped by the unsophisticated [Plaintiff]."  Reply, p. 5.  To

23  support this argument, Plaintiff cites Dr. Stoltz's observation that Plaintiff was slow to transfer

24  from the wheelchair to the exam table and required assistance from his wife.  Reply, p. 5; AR

25  371.  However, this evidence is insufficient to demonstrate, as Plaintiff argues, that he was

26  "confined to a wheelchair," and that Dr. Stoltz's limitations were supported.  Although the record

27  reflects that Plaintiff was prescribed a wheelchair by PA Parker in June 2005, Plaintiff essentially

28  testified that he uses a cane and a walker, but not a wheelchair.  AR 301-02, 638-39.

1  Furthermore, treatment records reflect that Plaintiff only used a cane, not a wheelchair, during

2  examinations by Dr. Whyman in May 2006 and by Dr. Baker in December 2006.  AR 249, 344.

3  Furthermore, Dr. Baker found no physiological basis for any assistive device.  AR 255.  Thus, the

4  ALJ appropriately discounted Dr. Stoltz's opinion regarding Plaintiff's limitation to sitting a

5  wheelchair because it was inconsistent with the record.  *See Batson*, 359 F.3d at 1195.

6       Based on the above, the ALJ provided specific and legitimate reasons supported by

7  substantial evidence for discounting Dr. Stoltz's opinion.

8  C.    Step 2:  Severe Mental Impairment

9       As a final matter, Plaintiff argues that the ALJ erred by finding that he does not suffer

10  from a severe mental impairment at step two in the sequential evaluation process.  An

11  impairment is not severe if the evidence establishes only a slight abnormality with no more than a

12  minimal effect on an individual's ability to work.  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th

13  Cir. 1996).

14       Plaintiff contends that the ALJ failed to mention Dr. Ikawa's opinion, which

15  demonstrated the presence of a severe mental impairment.[2]  Opening Brief, p. 19.  Contrary to

16  Plaintiff's contention, the ALJ expressly considered and rejected Dr. Ikawa's opinion.  AR 25,

17  262-77.  The ALJ explained that he found Plaintiff's mental impairment non-severe based on the

18  lack of evidence and the claimant's minimal treatment.  The ALJ supported this finding with

19  substantial evidence, including Plaintiff's lack of psychiatric treatment, clinical evidence

20  demonstrating only slight disability on work functions due to mental issues, and unreliable

21  psychiatric test results due to Plaintiff's overreporting of the extent and severity of his physical

22  and emotional problems.  AR 23, 25.

23

24

---

25     [2] Plaintiff also appears to argue that Dr. Ikawa limited him to simple repetitive tasks, which is not consistent
26  with the ability to perform unskilled jobs.  However, the capacity to perform simple repetitive tasks has been found
   consistent both with unskilled work and with specific vocational preparation level 2.  Social Security Ruling 85-15 *;*
27  *see also Sam v. Astrue,* 2101 WL 4967718, * 11 (E.D. Cal. Dec. 1, 2010) (ability to perform simple, repetitive tasks
   is consistent with unskilled work); *Hernandez v. Astrue*, 2010 WL 3835791, *5 (E.D. Cal. Sept. 29, 2010)
28  (reasoning level of two does not conflict with limitation to simple, repetitive tasks).   In this case, the ALJ found
   Plaintiff capable of performing work that the VE identified as unskilled.

1  Furthermore, treatment records reflect that Plaintiff only used a cane, not a wheelchair, during

2  examinations by Dr. Whyman in May 2006 and by Dr. Baker in December 2006.  AR 249, 344.

3  Furthermore, Dr. Baker found no physiological basis for any assistive device.  AR 255.  Thus, the

4  ALJ appropriately discounted Dr. Stoltz's opinion regarding Plaintiff's limitation to sitting a

5  wheelchair because it was inconsistent with the record.  *See Batson*, 359 F.3d at 1195.

6       Based on the above, the ALJ provided specific and legitimate reasons supported by

7  substantial evidence for discounting Dr. Stoltz's opinion.

8  C.    Step 2:  Severe Mental Impairment

9       As a final matter, Plaintiff argues that the ALJ erred by finding that he does not suffer

10  from a severe mental impairment at step two in the sequential evaluation process.  An

11  impairment is not severe if the evidence establishes only a slight abnormality with no more than a

12  minimal effect on an individual's ability to work.  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th

13  Cir. 1996).

14       Plaintiff contends that the ALJ failed to mention Dr. Ikawa's opinion, which

15  demonstrated the presence of a severe mental impairment.[2]  Opening Brief, p. 19.  Contrary to

16  Plaintiff's contention, the ALJ expressly considered and rejected Dr. Ikawa's opinion.  AR 25,

17  262-77.  The ALJ explained that he found Plaintiff's mental impairment non-severe based on the

18  lack of evidence and the claimant's minimal treatment.  The ALJ supported this finding with

19  substantial evidence, including Plaintiff's lack of psychiatric treatment, clinical evidence

20  demonstrating only slight disability on work functions due to mental issues, and unreliable

21  psychiatric test results due to Plaintiff's overreporting of the extent and severity of his physical

22  and emotional problems.  AR 23, 25.

23

24

---

25     [2] Plaintiff also appears to argue that Dr. Ikawa limited him to simple repetitive tasks, which is not consistent
26  with the ability to perform unskilled jobs.  However, the capacity to perform simple repetitive tasks has been found
   consistent both with unskilled work and with specific vocational preparation level 2.  Social Security Ruling 85-15 *;*
27  *see also Sam v. Astrue,* 2101 WL 4967718, * 11 (E.D. Cal. Dec. 1, 2010) (ability to perform simple, repetitive tasks
   is consistent with unskilled work); *Hernandez v. Astrue*, 2010 WL 3835791, *5 (E.D. Cal. Sept. 29, 2010)
28  (reasoning level of two does not conflict with limitation to simple, repetitive tasks).   In this case, the ALJ found
   Plaintiff capable of performing work that the VE identified as unskilled.

1    Plaintiff next argues that the ALJ failed to articulate specific and legitimate reasons for

2    rejecting the opinion of consultative psychiatric examiner, Dr. Miehiel.  In this case, the ALJ

3    gave "little weight" to Dr. Miehiel's opinion in part due to Dr. May's finding that Plaintiff's test

4    results were not reliable because of overreporting.  AR 25.  Plaintiff argues that Dr. May

5    performed testing as part of Dr. Whyman's psychiatric evaluation and therefore only Dr.

6    Whyman could interpret those results.  Plaintiff's argument is not persuasive.  Dr. Whyman

7    incorporated Dr. May's findings in his narrative report, stating that the resulting test profile was

8    of questionable validity primarily due to overreporting of symptoms across test instruments.  AR

9    349.

10    The ALJ also gave little weight to Dr. Miehiel's opinion because Plaintiff had a tendency

11    to exaggerate and was not very credible.  AR 25.  To the extent that Dr. Miehiel's opinion was

12    based on Plaintiff's subjective complaints, it may be disregarded where those complaints have

13    been properly discounted.  *See, e.g., Bray,* 554 F.3d at 1228 (ALJ reasonably discounted

14    physician opinion based on claimant's less than credible statements); *Tonapeytan,* 242 F.3d at

15    1149 (holding that when the record supports the ALJ's discounting of the claimant's credibility,

16    the ALJ is free to disregard a doctor's opinion premised on the claimant's subjective complaints).

17    Plaintiff has neither challenged the ALJ's credibility determination nor the use of that

18    determination to discount Dr. Miehiel's opinion.

19    The ALJ next discounted Dr. Miehiel's opinion because Dr. Whyman found no

20    significant psychiatric limitations.  AR 25.  Plaintiff claims that the ALJ was "patently wrong."

21    Opening Brief, p. 21.  He asserts that the ALJ failed to adequately consider Dr. Whyman's use of

22    workers' compensation ratings.  *See, e.g., Payan v. Chater,* 959 F.Supp. 1197 (C.D. Cal. 1996)

23    (ALJ failed to properly consider examining psychiatrist's use of workers' compensation

24    terminology).  Plaintiff points out that Dr. Whyman found evidence of slight disability on work

25    functions 1, 2, 4, 5, 6, 7 and 8 and slight to moderate disability on work function 3.  According to

26    Plaintiff, "moderate" in the workers' compensation context means a marked impairment.

27    However, findings made in a workers' compensation case are not conclusive in a Social

28    Security case.  *See Macri v. Chater,* 93 F.3d 540, 543-44 (9th Cir. 1996).  Moreover, the ALJ

considered Dr. Whyman's entire narrative report, not simply the ratings that were set forth in

Workers' Compensation parlance.[3]  AR 23.  The ALJ noted that Dr. Whyman assigned Plaintiff a

GAF of 61, which was indicative of mild symptoms.  AR 23.  Additionally, the ALJ considered

the objective findings of a mild to moderate depressive disorder, along with Dr. Whyman's

statement that he found no evidence of total and temporary disability.  AR 23, 26, 352.  The ALJ

also considered Plaintiff's statement to Dr. Whyman that he had mostly physical problems.  AR

23, 26, 337.  Further, on a summary form, Dr. Whyman opined that Plaintiff did not need current

or future medical care and could return to his usual job.  AR 354.

        The ALJ next discounted Dr. Miehiel's opinion, and found Plaintiff's mental impairment

non-severe, because Plaintiff had not received psychiatric treatment for a substantial period of

time.  The ALJ noted that while Plaintiff told Dr. Miehiel that he no longer saw a psychiatrist

because workers' compensation did not pay the doctor enough, the record demonstrated that the

psychiatrist dropped Plaintiff as a patient because he missed too many appointments and was

non-compliant.  AR 25.  Plaintiff attempts to argue that the most reasonable inference from his

statement to Dr. Miehiel is that the psychiatrist was not paid enough to deal with missed

appointments and non-compliance.  Opening Brief, p. 22.  Plaintiff's attempt to rehabilitate his

statement is not persuasive.  His purported "reasonable inference" does not rebut the ALJ's

finding that, contrary to Plaintiff's representations, he was dropped from treatment for non-

compliance and that he had not received psychiatric treatment for a substantial period.  An

"unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course

of treatment" can cast doubt on the sincerity of a claimant's subjective complaints. *Fair*, 885 F.2d

at 603.  However, in the case of a mental health disorder, failure to seek treatment may be an

unfortunate result of the disorder. *See Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th

Cir.1996). The ALJ improperly relied upon this factor in discounting Dr. Miehiel's opinion, but

this error was "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r*

*Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

        [3]Based on the Court's finding, it is unnecessary to engage in the calculus proposed by Plaintiff to determine
the percentage of limitation for rating disabilities in the workers' compensation context.

The Court finds that the ALJ properly considered the opinions of Drs. Ikawa, Miehiel and Whyman regarding Plaintiff's alleged mental impairments.  There is substantial evidence in the record that Plaintiff's mental impairment had no more than a minimal effect on his ability to work.  Therefore, the ALJ's determination at step two was not error.

## CONCLUSION

For the reasons stated, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Matthew S. Allen.


IT IS SO ORDERED.

**Dated:**   **April 25, 2011**                      **/s/ Dennis L. Beck**
                                                     UNITED STATES MAGISTRATE JUDGE